# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| PAMELA COLEMAN, ) | |
| ) | CASE NO.   1:10CV0663 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security ) | MEMORANDUM OPINION & ORDER |
| ) | |
| Defendant. ) | |

Plaintiff, Pamela Coleman ("Coleman"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Coleman's claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

### I.  Procedural History

On March 28, 2006, Coleman filed an application for POD and DIB benefits alleging a disability onset date of July 16, 2005, and claiming that she was disabled due to a back disorder and osteoarthrosis.  Her application was denied both initially and upon reconsideration.

Coleman timely requested an administrative hearing.

On December 2, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Coleman, appearing with a non-attorney representative,[1] testified. Ted Macy, an impartial Vocational Expert ("VE"), also testified. On May 13, 2009, the ALJ found Coleman was able to perform past relevant work as a field supervisor, or in the alternative, Coleman was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age 53 at the time of the administrative hearing, Coleman is "closely approaching advanced age" under social security regulations. *See* 20 C.F.R. § 404.1563. Coleman has a high school education (Tr. 95) and past relevant work as a field supervisor. (Tr. 19.) From December, 2004, to July, 2005, she worked temporarily as a data entry clerk. (Tr. 805.)

### **Relevant Medical History**

Jane Li, D.O., Coleman's primary physician, as well as other physicians from Li's practice, treated Coleman throughout 2005. They noted that Coleman had significant weakness and numbness in her lower back and lower right extremity, as well as positive straight leg raise testing. (Tr. 462, 467, 468, 470, 472, 476, 485, 491, 495, 503, 508, 512, 605.)

In March, 2005, a magnetic resonance imaging ("MRI") scan showed Coleman had a

---

[1]The hearing transcript refers to the representative as an attorney; however, the record reflects otherwise. (Tr. 24.) He is employed by Allsup as a Social Security Representative. (Tr. 27.)

small disc protrusion at L5-S1. (Tr. 748.) In March and April, 2005, David Blatt, M.D., examined Coleman and found that she was a healthy appearing woman with no weakness, intact sensation, symmetrical reflexes, and negative straight leg raising tests. (Tr. 505, 795-796.) Dr. Blatt assessed Coleman as possibly having right piriformis syndrome[2] and recommended a TENS ("transcutaneous electrical nerve stimulator") unit. (Tr. 505.)

Results of a pelvic MRI scan conducted in August, 2005, showed no significant abnormalities associated with the right sciatic nerve and, according to Teresa Larsen, D.O., the results were negative for piriformis syndrome. (Tr. 577.)

In March, May and August, 2005, Coleman underwent a series of three epidural steroid injections by Pasha Saeed, M.D., to treat her back pain. (Tr. 474-484, 493-502, 516-526.) Coleman stated she did not obtain significant relief from these treatments. (Tr. 472.) On September 15, 2005, Coleman returned to Dr. Li for treatment of low back pain and was diagnosed as having a lumbosacral disc herniation with impingement at S1. (Tr. 461.)

In January, 2006, Coleman underwent an electromyogram ("EMG") and a nerve conduction study to assess nerve root compression. (Tr. 581.) The results were normal, showing no signs of radiculopathy. (Tr. 585.) A March, 2006, MRI showed hypertrophic changes in the facet joints and ligaments throughout the lumbar spine with associated congenitally short pedicles and mild central canal stenosis at L4-L5, as well as a disc protrusion at L5-S1. (Tr. 741.)

---

[2]Piriformis syndrome is defined as a "compression of the sciatic nerve by the piriformis muscle in the posterior pelvis, causing pain in the buttocks and occasionally sciatica." The Merck Manual Online Medical Library, http//www.merck.com/mmpe/sec21/ch324/ch324j. Last visited on Nov. 4, 2010.

3

In June, 2006, Walter Holbrook, M.D., a state agency physician, reviewed Coleman's medical records and assessed her functional capacity. Dr. Holbrook concluded that Coleman retained the capacity to perform medium work, and that she could occasionally climb ladders, ropes and scaffolds, and frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.[3] (Tr. 428-435.) Specifically, Dr. Holbrook opined that Coleman was able to lift 25 pounds frequently and 50 pounds occasionally, and she could sit, stand, or walk for about 6 hours in an 8-hour workday. (Tr. 429.)

In July, 2006, Dr. Li examined Coleman based upon knee and back complaints and

---

[3]The regulations define the work levels as follows:

(a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) Medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567

diagnosed her with neuropathic pain. (Tr. 251-253.) In September, 2006, Coleman again complained of knee and back pain. (Tr. 249-250.) Dr. Li then diagnosed arthralgia and effusion of the knee. *Id*. On December 28, 2006, Coleman sought treatment for pain in her knee, lower back, legs, and feet. (Tr. 247.) Dr. Li diagnosed effusion of the knee and chronic pain, for which she prescribed Tramadol. (Tr. 247-248.)

On January 30, 2007, Dr. Li completed a physical residual functional capacity ("RFC") assessment. (Tr. 243-246.) She indicated that Coleman was able to sit and stand/walk for two hours each in an 8-hour workday. (Tr. 243.) She further indicated that Coleman could lift five pounds frequently and twenty pounds occasionally; and, that Coleman could occasionally climb, balance, and reach above shoulder level, but never stoop, kneel, crouch, or crawl. (Tr. 244.) Dr. Li also placed a severe restriction against unprotected heights. *Id*. Finally, Dr. Li concluded, based on myofascial disabling pain, that Coleman was precluded from working full-time at even a sedentary position. (Tr. 245.)

In August, 2007, Coleman went through several sessions of physical therapy. (Tr. 334-338.) That same month, Coleman underwent an MRI of the right knee. (Tr.324.) The results showed a diminished ACL, as well as a tear of the posterior aspect of the medial meniscus. (Tr. 325.) Coleman was seen by John Wood, M.D., for her knee pain. (Tr. 320-322.)

In November, 2007, Dr. Li diagnosed fibromyalgia after finding that Coleman had nine out of eighteen tender points on her neck, shoulders, arms, hips, legs, and ankles. (Tr. 353.) Dr. Li prescribed Tramadol for the pain. *Id*. Also, at this examination, Coleman demonstrated normal deep tendon reflexes, normal sensory responses, normal strength, and a normal gait in her lower extremities. *Id.* In January, 2008, Dr. Li opined that Coleman is unable to work due to

chronic pain, as well as medication side effects that make her drowsy. (Tr. 351.)

In March, 2008, Anthony Petruzzi, Dr. Li's assistant, opined that Coleman was disabled due to fatigue, a consequence of her fibromyalgia. (Tr. 303.) In May, 2008, Mr. Petruzzi completed an RFC evaluation indicating that Coleman had no ability to lift, walk, stand, sit, or perform any postural activities, such as climbing, balancing, stooping, kneeling, crouching, crawling, or reaching above shoulder level. (Tr. 298-299.)

In September, 2008, Coleman treated with Vasantha Kumar, M.D., for pain management. (Tr. 192-195.) Physical examination revealed that Coleman appeared well, "in no apparent distress" and was pleasant and cooperative. (Tr. 193.) In the same paragraph, Dr. Kumar noted that Coleman appeared to be in mild to moderate pain. *Id*. The doctor also noted an antalgic gait, moderate facet joint tenderness in the lumbar area, painful and reduced range of motion in the lumbar spine, and diminished deep tendon reflexes in the right knee. *Id*.

In January, 2009, after the hearing, the ALJ arranged for Coleman to be examined by consulting physician, Sam N. Ghoubrial, M.D., who noted mostly normal objective examination findings (Tr. 169-172), except for some moderately decreased range of motion in the lumbosacral spine. (Tr. 171.) He found Coleman demonstrated a normal ability to get on and off the examination table, normal heel to toe walking, and had no need for a cane or walker. (Tr. 172.) He further found she had a mild decrease in the range of motion of her knees. *Id*. When assessing Coleman for fibromyalgia, Dr. Ghoubrial found that she identified a pseudo-trigger point just above the nasal bridge, suggesting that she had a "fictitious component to the nature of her complaints." (Tr. 173.) Dr. Ghoubrial noted that Coleman had "no difficulty sitting, standing, hearing, speaking, or traveling." *Id*. He also noted that she would have no difficulty

6

handling objects or walking. *Id*.

Dr. Ghoubrial also completed a manual muscle testing form finding Coleman had normal (5/5) muscle strength in all of her muscle groups, and normal abilities to grasp, manipulate, pinch, and coordinate with her hands. (Tr. 174.) She had no muscle spasms or muscle atrophy. (Tr. 175.) Her ranges of motion were normal in all joints (Tr. 175-177), and slightly reduced in her dorsolumbar spine. (Tr. 171.)

On February 23, 2009, Dr. Ghoubrial completed a physical assessment form indicating that Coleman could lift and carry up to 50 pounds frequently and 20 pounds continuously (Tr. 178), and could without interruption, sit for three hours at a time, stand for two hours at a time, and walk for two hours at a time. (Tr. 179.) He further indicated that, in an eight-hour day, Coleman could sit for three hours, stand for three hours, and walk for three hours. *Id*. She did not need a cane to walk. *Id*. Dr. Ghoubrial further indicated that Coleman was able to continuously reach, handle, finger, feel, push, pull, and operate foot controls. (Tr. 180.) She could frequently climb, balance, and stoop, and occasionally kneel, crouch, and crawl. (Tr. 181.) Dr. Ghoubrial concluded that Coleman was capable of a wide range of physical activities, including shopping, traveling, using public transportation, climbing steps, preparing simple meals, feeding herself, caring for her personal hygiene, and sorting/handling papers and files. (Tr. 183.)

### *Hearing Testimony*

At the hearing, Coleman testified to the following:

- She suffers from severe pain in her lower back, buttocks, and both legs (Tr. 813), including a shooting pain in her right leg that radiates down causing numbness in her right foot. (Tr. 814, 815.)

- She suffers from fibromyalgia, which causes her entire body to ache. (Tr. 820.) She also has shooting pain that originates in her lower back and radiates to her upper back. *Id.*

- She suffers from knee problems, in which both knees swell two or three times per week. (Tr. 816.) Her right knee is worse than the left. *Id.* She relieves the swelling and pain by elevating her feet. *Id.*

- Because she has difficulty bending, her husband helps her dress. (Tr. 821.)

- She cooks quick meals as she cannot stand for long. (Tr. 821.) She helps with the light housework, but her husband does the heavier housework. *Id.*

- She is able to drive short distances, and does so perhaps once or twice a week. (Tr. 804.)

- At the store, she uses an electric scooter as she cannot walk well and she tires easily. (Tr. 821.)

- If she sits too long, she experiences a "pins and needles" sensation in her feet. (Tr. 822.)

- As to her functional limitations, she testified that she can stand on her feet about five minutes and she cannot walk any longer than from the garage to the mailbox. *Id.* She does not use an ambulatory device. *Id.* When she was working, she used a back brace. (Tr. 822-823.) For pain, she uses a TENS unit on her lower back at least three to four times a week. (Tr. 823-824.) She can only sit five to ten minutes at a time. (Tr. 824-825.)

- She attends church two times a week. (Tr. 839.) On the weekends, she and her husband visit her mother-in-law. (Tr. 840.)

- She watches television and reads the Bible. (Tr. 840.)

The ALJ posed the following hypothetical to the VE:

Assume we are discussing a person of the same age, education and work background . . . and that this person is capable of medium level work and – but had some limitations. Assume that this person could only occasionally climb ladders, ropes and scaffolds. Other than that it would be a full range of medium work.

(Tr. 856-857.)

8

The VE testified that such an individual could perform Coleman's past relevant work as a field supervisor, not lifting more than 25 pounds, which is as she performed the job after her back injury in June, 2003.  (Tr. 857-858.)  The ALJ asked the VE to consider the same hypothetical, with no climbing of ladders, ropes or scaffolds.  With these limitations, the VE testified that Coleman could not perform her past work as a contract inspector (or field supervisor), but she could perform the data entry position she was doing in 2005.

The ALJ next inquired of the VE, using the first hypothetical, if there were other jobs she could perform that exist in the significant numbers in the economy.  The VE testified that such an individual could perform jobs such as  laundry laborer (1,000 jobs in Northeast Ohio; 170,000 nationally) or dining room attendant (2,000 jobs in Northeast Ohio; 310,000 nationally), both medium, unskilled jobs.

The ALJ further asked the VE to assume the following:

> If we're discussing a person of the same age, education and the work background and this person could sit, stand or walk – well, sit only two hours in an eight-hour day, stand or walk two hours in an eight-hour day, could lift 20 pounds occasionally, and had other limitations.  But if sitting, standing, and walking were that limited would there by any jobs that exist in significant numbers?

(Tr. 860.)

The VE testified that there would be no jobs available.  *Id.*  Lastly, the VE asked if assuming all of the above limitations and that "the person is impaired to the extent the claimant testified would there be any jobs that she could do?"  *Id*.  Again, the VE testified there would be no jobs.

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

9

time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Coleman was insured on her alleged disability onset date, July 16, 2005, and remained insured through the date of the ALJ's decision. (Tr. 11.) Therefore, in order to be entitled to POD and DIB, Coleman must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Coleman established a medically determinable, severe impairment, due to

---

[4] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

disorders of the lumbar spine and fibromyalgia; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Coleman was found capable of performing her past work activities, and was determined to have a Residual Functional Capacity ("RFC") to perform all the basic work activities described in 20 C.F.R. §§ 404.1521 and 404.1545. The ALJ concluded that Coleman was not under a disability from July 16, 2005, through the date of his decision.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## VI.  Analysis

Coleman claims the ALJ erred by: (1) disregarding the consistent opinions of Coleman's treating sources and the consultative examining physician; and (2) disregarding the medical-vocational guidelines, which direct a finding of "disabled."

### Treating Source Opinions

Coleman contends the ALJ ignored the findings of her treating physician, and the physician's assistant, who both stated that Coleman was not capable of even sedentary work. (Doc. No. 11 at 9-11.) Coleman also argues that the ALJ ignored Social Security's own consultative physician who opined that Coleman could perform a range of sedentary to reduced light work. (Doc. No. 11 at 10.) The Commissioner claims that the RFC finding was consistent with the opinions of the consultative examining physician and the state agency reviewing physician. (Doc. No. 12 at 8-12.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled

to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security

---

[5]Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

> The ALJ concluded that Coleman has the following RFC:
>
> Since the amended July 16, 2005 alleged onset date, and with the exception of possible brief periods of less than 12 continuous months, Ms. Coleman has retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521 and 404.1545 within the following parameters: she can lift, carry, push, pull up to 25 pounds frequently and up to 50 pounds occasionally; and she can sit with normal breaks for six hours in an eight-hour period; and she can stand and/or walk for six hours in an eight-hour period; and she can occasionally climb/descend ladders, ropes or scaffolds.

(Tr. 15.)

The ALJ, giving greater weight to the state agency reviewing physician and the consulting physician, noted as follows:

> In concluding that Ms. Coleman's impairments have not met or medically equaled a listed impairment at any time since the amended July 16, 2005 alleged onset date, the undersigned has considered all of the medical source opinions in this record including several treating source opinions that are give [sic] little weight with respect to this "step 3" issue [fn. 12]. Instead, greater weight is given to the opinion of the state agency physician who reviewed this record (see Exs. 365F to 372F), and to the opinions of the consulting physician who examined Ms. Coleman on January 6, 2009[fn. 13 omitted].
>
>> Fn. 12. Medical source opinions in this record are found in exhibits 365F to 372F, 450F, 501F to 503F, 505F, 506F, 557F to 560F, 619F to 624F, and 629F. The reports marked as exhibits 450F, 501F to 503F, 505F, 506F, and 557F to 560F are from

14

> treating sources. As will be discussed again in greater detail below in the Finding 5 discussion, these treating source opinions are given little weight because they are not supported by the record as a whole and because they are not consistent with the opinions of the state agency physician who reviewed this record (see Exs. 365F to 372F), or with the opinions of the consulting physician who examined Ms. Coleman on January 6, 2009 (see Exs. 619F to 624F, and 629F).

\*\*\*

Ms. Coleman's allegation that she is disabled is also not consistent with the opinions of the state agency physician who reviewed this record and completed the report marked as exhibits 365F to 372F. Similarly, Ms. Coleman's allegation that she is disabled is not consistent with the information and opinions found in the report of the consulting physician who examined Ms. Coleman on January 6, 2009 (see Exs. 619F to 634F)[fn. 22]. The fact that these medical sources offered opinions that Ms. Coleman had a residual functional capacity that would allow for medium work activity on a full-time basis casts further doubt on Ms. Coleman's allegation that she is disabled.

> Fn. 22. In assessing the claimant's residual functional capacity and overall credibility, the undersigned has placed great significance on Dr. Ghoubrial's comment that, during his examination of Ms. Coleman on January 6, 2009, Ms. Coleman had "a pseudo trigger point for fibromyalgia just above the nasal bridge suggesting a fictitious component to the nature of her complaints" (see Ex. 629F).

The residual functional capacity being assigned in this case is generally consistent with the above-mentioned medical source opinions.[fn. 23] In assessing Ms. Coleman's residual functional capacity, lesser weight is given to the residual functional capacity opinions offered by several treating sources.[fn. 24] Besides being inconsistent with the opinions of the state agency reviewing physician and the opinions of Dr. Ghoubrial, these treating sources opinions are not supported by the objective medical evidence including these treating sources' own records. The undersigned also concludes that, in completing these reports, these treating sources gave undue deference to Ms. Coleman's subjective complaints.[fn. 25]

> Fn. 23. After examining Ms. Coleman on January 6, 2009, Dr. Ghoubrial offered the opinion that Ms. Coleman would not have any problems sitting, standing, walking, or handling objects (see Ex. 629F). Although it seems that Dr. Ghoubrial indicated six weeks later at exhibits 621F and 623F that Ms. Coleman does not

15

> have a residual functional capacity for a full range of medium work, the undersigned places greater significance on Dr. Ghoubrial's narrative opinion at exhibit 629F than he does to Dr. Ghoubrial's checkbox answers in exhibits 621F and 623F. To the extent it is argued that Dr. Ghoubrial's opinions are not consistent with the residual functional capacity being assigned in this case, those portions of Dr. Ghoubrial's opinions are rejected because they are contrary to the opinions of the state agency physician [Dr. Holbrook] who reviewed this record.
>
> Fn. 24. See Exs. 450F, 501F to 503F, 505F, 506F and 557F to 560F.
>
> Fn. 25. It is evident from these reports that the work-related limitations identified in the reports were based on Ms. Coleman's subjective reporting of symptoms.

(Tr. 14-15; 18-19.)

Coleman argues that the ALJ erred by arbitrarily assigning controlling weight to Dr. Holbrook's opinion without providing clear, specific reasons for rejecting Dr. Li and Mr. Petruzzi's opinions.

Even though the ALJ found that Coleman's fibromyalgia is a severe impairment, he subsequently discounted that limitation based on Dr. Ghoubrial's notes indicating that Coleman responded positively to a "pseudo trigger point" for fibromyalgia. The ALJ then relied on Dr. Holbrook's RFC evaluation performed in June, 2006, prior to Dr. Li's diagnosis of Coleman with fibromyalgia. He also relied on Dr. Ghoubrial's findings that Coleman "would have no difficulty sitting, standing, hearing, speaking or traveling. I don't feel she would have any difficulty handling objects or walking." (Tr. 173.) The ALJ explained the conflict in Dr. Ghoubrial's opinion in footnote 23. Dr. Ghoubrial noted in a written opinion at the January, 2009, examination that Coleman's RFC allowed a full range of medium work, but then approximately six weeks later, Dr. Ghoubrial indicated, by checking boxes, that Coleman did not

16

have an RFC for a full range of medium work. (Tr. 18-19, fn.23.) The ALJ explained that he gave greater weight to Dr. Ghoubrial's earlier notes. *Id*.

Furthermore, the ALJ did not ignore Coleman's treating sources' opinion. (Doc. No. 11 at 11.) The ALJ indicated that he gave "lesser weight" to the RFC opinions offered by the treating sources, Dr. Li and Mr. Petruzzi, as they were not supported by the objective medical evidence, they were contrary to the treating sources' own records, and they were inconsistent with the opinions from Drs. Holbrook and Ghoubrial. (Tr. 19, fn.24.) Moreover, neither treating source tied any particular finding to fibromyalgia or described the limitations imposed because of the diagnosis.

The ALJ also considered Coleman's testimony and gave reasons for why he found it not fully credible. Other than her treating sources' RFC assessments, Coleman points to nothing else in support of her claim that she had greater limitations than the ALJ determined.

Coleman's second argument as to the application of the medical vocational guidelines need not be addressed, as those guidelines are premised on a sedentary work level. *See* 20 C.F.R. Pt. 404, Subpt. P, App.2, Table No. 1 – Residual Functional Capacity: Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s). Coleman argues that the ALJ did not properly assess her RFC. She argues the ALJ should have found her capable of performing only sedentary work. Further, if he had done so, the medical vocational guidelines would have directed a finding of "disabled." (Doc. No. 11 at 12.) As previously explained, the Court finds that the ALJ's conclusion of medium work was supported by substantial evidence.

17

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

                                             s/ Greg White
                                             United States Magistrate Judge

Date: December 10, 2010